**1576**

KERR–McGEE CHEMICAL CORPORATION, Plaintiff,

v.

UNITED STATES, Defendant,

and

Mitsui Denman (Ireland) Ltd., Intervenor–Defendant.

CHEMETALS, INC., Plaintiff,

v.

UNITED STATES, Defendant,

Mitsui Denman (Ireland) Ltd., Intervenor–Defendant.

Court Nos. 89–03–00152, 89–03–00170.

United States Court of International Trade.

June 5, 1991.

Gardner, Carton & Douglas, W.N. Harrell Smith, IV, M. Peter Adler, and George N. Grammas, Washington, D.C., for plaintiff Kerr–McGee Chemical Corp.

Squire, Sanders & Dempsey, Ritchie T. Thomas, William D. Kramer, Dana M. Stein, and Miriam A. Bishop, Washington, D.C., for plaintiff Chemetals, Inc.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jane E. Meehan (Gregory Shorin, Atty.–Advisor, Office of Chief Counsel for International Trade, U.S. Dept. of Commerce, of counsel), Washington, D.C., for defendant.

Marks Murase & White, Roger L. Selfe, Matthew J. Marks, Ramon P. Marks, and Neil E. McDonell, New York City, for intervenor-defendant.

## MEMORANDUM AND ORDER

RESTANI, Judge:

Plaintiffs move for judgment on the administrative record of the Final Determination on Remand of the International Trade Administration ("ITA" or "Commerce") and ask the court to determine that sales of Electrolytic Manganese Dioxide ("EMD") from Ireland were likely during the Period of Investigation ("POI"), December 1, 1987, to May 31, 1988, and to remand to ITA to determine the dumping margin. For the reasons stated below, the court denies plaintiffs' request and affirms ITA's determination.

## PROCEDURAL HISTORY

The factual and procedural background of this case is set forth in the court's previous opinion, *Kerr–McGee Chemical Corp. v. United States*, 14 CIT ——, 739 F.Supp. 613 (1990), with which the court presumes the reader to be familiar.

The court's major findings in that opinion were as follows. The court held that ITA had conducted an adequate investigation and had not abused its discretion in refusing to extend the POI backwards, but the court found that ITA was required to reconsider its determination that sales were not likely during the POI. *Id.*, 739 F.Supp. at 622 and 628. The court explained that ITA's key reasons for not finding likely sales were "all based on erroneous or unexplained standards." *Id.* at 622.

The court noted that the determination of no likely sales depended, under ITA's reasoning, on the lack of an irrevocable offer of sale during the POI. *Id.* at 623. Although ITA claimed to use a different definition of an irrevocable offer than that

which practitioners and courts generally employ, the court found ITA's explanation insufficient, and that at the very least such a standard would be misleading. Moreover, the court noted that ITA defined "irrevocable" as "imminent," [1] but that ITA had not explained why an irrevocable offer was more susceptible of imminent acceptance than a revocable offer. *Id.* at 624. The court also held that ITA's finding of no likely sales was not supported by the fact of incomplete qualification (for continuing use in the purchaser's battery production) of Mitsui Denman Ireland's ("MDI") EMD in this case, as sales for qualification were nonetheless sales. Finally, the court held that ITA did not properly analyze whether actual sales occurred a few days after the POI. Under the facts of record, such sales would indicate likely sales during the POI.

Accordingly, the court instructed ITA to "define a standard for determining whether sales are likely which considers industry practice and which will capture imminent sales." Because the purchase orders, which appeared to evidence actual sales, were canceled, the court also directed ITA to "explain its policy on canceled sales in terms of the governing statute and this case." [2] *Id.* at 628.

The court's general instruction to ITA was to

determine whether U.S. sales existed or were likely. In doing so it shall consider the relationship, if any, between the primary purchaser's orders and the pre-existing Agreement, and it shall consider the activities discussed here of the primary purchaser, the potential purchaser

---

**1.** The reference to "imminent sale" may find its origin in the legislative history of the Trade and Tariff Act of 1984, Pub.L. 98–573, Oct. 30, 1984, 98 Stat. 2948. A report by the House Committee on Ways and Means provided that an investigation may be initiated "where actual importation has not yet occurred but a sale for importation has been completed or is imminent." H.R.Rep. No. 725, 98th Cong., 2d Sess. 11, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5137.

**2.** Although Commerce held that canceled sales were "sales" for antidumping purposes, it failed to respond to the court's request that "ITA

should explain if cancellations to avoid antidumping orders should be considered differently from other cancellations." 739 F.Supp. at 627. At oral argument, held on May 21, 1991, counsel for the government stated that ITA did not reach this question because it determined that the canceled purchase orders did not evidence sales. Although the requested finding has proved unnecessary for other reasons, ITA may not avoid directions to make findings on collateral issues. The court requires certain findings for reason of judicial economy when it is unclear that ITA is applying proper standards.

and MDI.[3]

*Id.*

On July 11, 1990, plaintiff Kerr–McGee requested that ITA re-open the record on remand to take evidence on (i) industry practice as to the use (or non-use) of irrevocable offers, (ii) whether MDI and the primary purchaser reached a well defined agreement during the POI, and (iii) MDI's motivation in requesting the primary purchaser to cancel its June 9, 1988 orders.

On August 17, 1990, ITA sent a letter to counsel enclosing its draft remand determination stating that its request to reopen the record was denied. ITA did state, however, that it would accept factual information regarding the 1988 Agreement "that was *accessible and in existence* between the date verification was completed (December 16, 1988) and the signing of the Department's final determination (February 22, 1989)." Letter from Roland Mac-Donald, Director of Antidumping Compliance, to W.N. Harrell Smith IV of Drinker Biddle & Reath (Aug. 17, 1990); Appendix 2 to Memorandum in Support of Plaintiffs' Motion for Judgment upon the Agency Record After Remand ("P. Brief") (emphasis in original).

In its remand determination of October 12, 1990, Commerce stated:

In determining whether the merchandise subject to investigation is likely to be sold in the United States at less than fair value, the Department requires evidence of an irrevocable offer to sell the subject merchandise. [Citation omitted]. The Department defines an irrevocable offer as an offer on the part of the seller binding it to sell the subject merchandise at a specific price for a specified period of time.

Remand Determination at 4.

Commerce noted that while other types of offers may indicate that a sale is likely to occur,

more than a speculative potential of future sales is necessary to satisfy the likelihood of sales criteria of the Act.

*Certain Carbon Steel Products from Czechoslovakia,* 50 Fed.Reg. 1912 (1985). In the absence of actual sales, the Department must have evidence that establishes, with a sufficient degree of definiteness, that a sale is imminent at a price sufficiently reliable to form the sole basis of a dumping determination.

Remand Determination at 3. Commerce proceeded to explain that

irrevocable offers serve as a better benchmark of pricing practices than revocable offers, because if a seller's offer is revocable, it has the option of withdrawing or modifying the offer at any point in time ... With irrevocable offers, the seller is bound to sell at a specific price; it does not have the option of withdrawing or modifying the terms of the offer ...

Remand Determination at 4.

In discussing the two purchase orders from the primary purchaser, ITA stated that:

*[o]ur examination of the record reveals that the two purchase orders essentially represent bids by a U.S. buyer to purchase the subject merchandise at a price and quantity specified by the buyer. In this industry, unless the purchase orders are tied to a larger agreement binding the seller to supply the merchandise at the price specified, the seller is not bound by the terms of the purchase order;* a valid contract is not formed. *See* C.R.Doc. 2 at 142A; C.R. Doc. 24 at 329A; P.R.Doc. 81 at 875. If the two purchase orders are tied to a comprehensive agreement to sell the subject merchandise to the U.S. purchaser, a valid contract would be formed upon issuance of the purchase orders.

In this case, a purchasing agreement existed between MDI and the U.S. purchaser who issued the aforementioned purchase orders. However, this agreement only covered two grades of EMD produced by MDI. These grades were destined

---

**3.** "Primary purchaser" and "potential purchaser" refer to unrelated U.S. battery manufacturers. The activities of the "potential purchaser"

are not pertinent to the objections to the remand determination.

for sales to a third country and not to the United States. Since the agreement does not cover the EMD specified in the purchase orders, MDI was never bound to sell EMD to the United States at the stated price.

Although the agreement provides for inclusion of other grades of EMD upon mutual written agreement, verification of customer files at MDI and Mitsui New York demonstrate that the agreement was not modified to include the subject merchandise. C.R.Doc. 24 at 333A–336A; C.R.Doc. 32 at 754A. *Therefore, the purchase orders were merely solicitations to purchase EMD by a U.S. buyer and did not represent actual sales (canceled or otherwise) of EMD.* The Department cannot make a finding of likely sales based solely on the existence of the two purchase orders, because they do not demonstrate that the *seller* was committed to sell the subject merchandise at a stated price for a specified period of time.

Remand Determination at 7–8 (emphasis added).

Commerce concluded that "[t]here were no sales made by MDI during the POI nor irrevocable offers to sell the subject merchandise during the POI which would indicate a likelihood of sales." Remand Determination at 6.

## DISCUSSION

The parties expend much effort in disputing the proper amount of deference which the court must grant to ITA's interpretation of the statute. Defendant argues that the court must defer to the agency's expertise. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Plaintiffs maintain that the question at issue is one of pure statutory interpretation and not one of agency discretion and, moreover, does not call for ITA's expertise.

Petitioners, relying on a leading pre-*Chevron* treatise, argue that *Chevron* is merely part of one of two lines of cases dealing with the amount of deference owed by the courts to an agency's interpretation of the statute it administers. One line standing for the proposition that substantial deference is proper, the other for the proposition that little or none is owed. *See* 5 K. Davis, *Administrative Law Treatise* § 29 (1978). Plaintiffs fail, however, to cite Professor Davis's post-*Chevron* supplement to his treatise, *Administrative Law of the Eighties* § 29 (1989), which indicates that the Supreme Court has closed off the line of cases standing for the proposition that the court may substitute its own interpretation of a statute for a reasonable interpretation by the agency charged with its administration, with which the court disagrees.

■ The court notes, however, that the amount of deference which courts of specialized jurisdiction must give to an agency's expertise may not parallel that of courts whose jurisdiction is more general. Moreover, the Court of Appeals for the Federal Circuit has stated that while

[w]e give due weight to the agency's interpretation of the statute it administers, and we accept that interpretation if it is "sufficiently reasonable ..." (citations omitted), we cannot sustain the ITA's exercise of administrative discretion if it contravenes statutory objectives. "Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion'." [Citations omitted].

*IPSCO, Inc. v. United States*, 899 F.2d 1192, 1194–95 (Fed.Cir.1990) (ITA improperly disregarded companies receiving little or no subsidy from the calculation of an average net subsidy) (emphasis in original). Thus, the first question confronting the court is whether the standards ITA applied in making its remand determination are the result of a reasonable interpretation and application of the governing statute.

In the last opinion, the court fully discussed the history of, and the court's concern with, the "irrevocable offer" standard. 739 F.Supp. at 623–24. In that case, ITA

argued that "[t]he 'irrevocable offer' standard ensures that sales which are imminent will be captured, ..." *Id.* at 624. The court stated that it was unclear how the "irrevocable offer" standard accomplished this. *Id.* Nevertheless, Commerce persists in its failure to explain how this standard captures all imminent sales. Defendant argues that

> Commerce's irrevocable offer standard captures imminent sales by:
>
> provid[ing] the Department with evidence that a seller is committed to sell the subject merchandise at a specified price: the seller does not have the option of withdrawing the offer for the period of time stated. The decision to purchase the merchandise at the specified price rests solely with the buyer for the period of irrevocability.

Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment upon the Agency Record After Remand ("D. Brief") at 11. None of this relates to imminence. Defendant goes on to argue that "[t]he only thing necessary to complete the sale is for the buyer to accept the seller's terms." *Id.* Of course, this is true of any *bona fide* offer which includes a price term. The court's fears are not allayed by Commerce's assurance that

> [t]he Department takes into account industry practice by allowing parties to provide the Department with evidence that offers in the industry in question, while not formally stating their irrevocability, nevertheless demonstrate, as a matter of practice, that a seller is *committed* to sell the subject merchandise at a specific price.

Remand Determination at 5 (emphasis added). Nothing indicates that, in the context of this case, Commerce means anything other than "irrevocable" by use of the word "committed."

Plaintiffs argue that the court should overrule the irrevocable offer standard in favor of the *bona fide* offer standard formerly used by ITA. *See Dismissal of Antidumping Petitions on Steel Products from Romania,* 47 Fed.Reg. 5,752 (Feb. 8, 1982). *Bona fide* offers encompass both

revocable and irrevocable offers. Commerce argues that "[a]lthough it is possible, in certain instances, that revocable offers may indicate that sales are reasonably expected in the future, they do not demonstrate a commitment to a specific price on the part of the seller. Revocable offers can be withdrawn or revised at any time, encompassing such a wide spectrum of activities (including price lists and other forms of solicitation) that the price is too speculative upon which to base a LTFV determination." Remand Determination at 12.

It is simply not true that revocable offers do not demonstrate a commitment to a specific price by a seller. If the seller states a price term to which it will be committed if the buyer accepts, this represents a commitment. If a purchaser can bind a seller by accepting an offer to sell a specific quantity at a specific price then it is not apparent why this should be any less a basis for a finding of likely sales than is an irrevocable offer. If a buyer cannot bind a seller by accepting an offer to sell, then the offer to sell is not a *bona fide* offer.

ITA has failed to provide any reasonable justification for its requirement that irrevocable offers exist in order for sales to be likely under 19 U.S.C. § 1673 (1988). There is apparently no support for the proposition that an irrevocable offer is more indicative of likely sales than one which is revocable. Nor does there appear to be any reason to believe that an irrevocable offer indicates that a sale is any more "imminent" than does a revocable offer. *See supra* at 1577. As indicated in the previous opinion, the fact that some industries, such as the one at issue, apparently do not use the irrevocable offer device is of concern, as it would be contrary to Congress's intent to exempt such industries from a finding of likely sales. 739 F.Supp. at 624.

The court does accept, as a reasonable application of the statute, ITA's insistence on evidence of the seller's intention to sell at a specific price. A *bona fide* offer will satisfy this aspect of "likely sales." ITA,

of course, may consider additional factors in deciding whether sales are imminent, depending on the facts of the particular case,[4] but ITA's use of a bright-line irrevocable offer standard to preclude a finding of likely sales in this case was not reasonable.

■ Nonetheless, the court finds that ITA's negative determination on remand in this case should stand despite continued use of an "irrevocable offer" standard in this case. In the course of the remand investigation ITA made factual findings which, together with ITA's earlier factual findings, warrant a negative determination under any of the statutorily consistent standards discussed by the parties and the court in this matter.

As directed in the court's last opinion, 739 F.Supp. at 628, on remand ITA investigated whether MDI and the primary purchaser had made MDI's new EMD formulation a part of the 1988 Purchase Agreement. ITA concluded that they had not, despite the fact that the purchase orders referenced the Agreement. Thus, there were no actual, but canceled, sales under the Agreement. Plaintiffs do not challenge this finding.

The court also instructed ITA to examine the "activities" of the primary purchaser and MDI as evidenced in the record to determine if such activities indicated likely sales. *Id.* Although its overall finding of no likely sales was premised on the irrevocable offer standard, in the course of making that determination, Commerce also determined that nothing in the record indicated that the purchase orders constituted anything other than solicitations. Remand

Determination at 8. Application of a particular standard does not alter this factual finding, but plaintiffs challenge this factual conclusion.

Plaintiffs claim that the record indicates that, in the EMD industry, long-term agreements cover only qualified EMD, not EMD for qualification purposes, and challenge ITA's conclusion that if orders are not tied to such agreements, that they never bind the seller. In essence they claim that for *unqualified* merchandise, purchase orders follow oral offers to sell specific quantities at a specific price. Plaintiffs cite what they refer to as evidence of a course of dealing between the parties. Confidential Record Document 13, at 248A–49A. The cited document, however, deals with a small purchase made prior to the 1988 Agreement. Its existence does not conflict with ITA's view that large purchases for qualification would be made only pursuant to the later existing written Agreement.[5] In ITA's view the fact that the primary purchaser referenced the 1988 Agreement on the purchase orders indicates that it intended to make this purchase, for qualification purposes, pursuant to the 1988 Agreement, notwithstanding that it failed to do so properly. Based on the facts of record ITA cannot be said to have erred in finding that the failure to amend the 1988 Agreement to cover the large qualification bid is evidence that the seller had not committed itself to the price on the purchase orders. In addition, the Verification Report indicates that contacts between the primary purchaser and MDI near the end of the POI amounted to nothing more than "an inquiry to Mitsui NY ..." Public Document 76, at 765.[6] ITA's

---

**4.** For example, the seller may be willing to sell at a certain price, but if there is no buyer immediately on the horizon, it would be difficult to call the sale "imminent."

**5.** Although prior to remand the court found that the record would support a finding of the existence during the POI of a well-defined agreement to sell, ITA's factual findings on remand were to the contrary.

**6.** It may be that, because ITA's case officer relied on the irrevocable offer standard during her investigation, she failed to adequately follow up leads to an oral, revocable offer which,

combined with the post POI orders, and other evidence of a course of dealing could indicate likely sales during the POI. Plaintiff Kerr–McGee, in its complaint of April 19, 1989, and again in plaintiffs' brief submitted prior to the court's remand order, requested that the ITA conduct a broader investigation. The request, however, was not specifically directed to the oral discussions of April and May, 1988. At that time, plaintiffs were asking for both retroactive and subsequent extension of the POI, as well as investigation of all potential domestic EMD customers. At this late date, to order an investiga-

factual conclusions regarding the course of conduct of parties are supported by substantial evidence.

The court declines to examine issues relating to the Statute of Frauds or equitable estoppel. The ultimate issue before ITA is not whether there was an enforceable sales agreement, but whether the seller was ready, willing and able to sell a specific quantity at a specific price and whether a buyer was equally ready, willing and able to buy the same, so that sales may be said to be imminent. As indicated, ITA found that the purchase orders were not made pursuant to the 1988 Sales Agreement and that sales would not have been made except in accordance with a modification of that agreement. ITA found such modification did not occur. These factual conclusions preclude a finding that the seller intended to sell the EMD grade at issue at the price stated in the purchase orders and that the sales were imminent.

## CONCLUSIONS

Despite the court's inability to accept the "irrevocable offer" standard applied in the remand, the court nevertheless upholds

ITA's determination because the factual findings made in its original determination combined with those made on remand require a negative determination, under any reasonable standard of likelihood of sales. Accordingly, the determination is AFFIRMED.

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiffs' motion for judgment on the agency record be, and hereby is, denied; and it is further

ORDERED, ADJUDGED AND DECREED that this action be, and hereby is, dismissed.

tion into the nature of oral discussions assured-

ly would render little useful information.