**MONSANTO COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

v.

**NISSAN CHEMICAL INDUSTRIES, LTD., et al., Intervenors.**

**Court No. 87–01–00001.**

United States Court of International Trade.

Oct. 14, 1988.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, David Scott Nance, and Lane S. Hurewitz, Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Graham & James, Yasuhiro Hagihara, Los Angeles, Cal., Lawrence R. Walders, Washington, D.C., and Denis Oyakawa, Los Angeles, Cal., for defendant-intervenor Nissan Chemical Industries, Inc.

Weil, Gotshal & Manges, A. Paul Victor, Charles H. Bayar and Douglas A. Nave, New York City, for defendant-intervenors Shikoku Chemical Corp. and Mitsubishi Corp.

## OPINION

RESTANI, Judge:

This matter is before the court on plaintiff's motion for judgment upon the administrative record pursuant to Rule 56.1 of the Rules of this Court. In this action, plaintiff challenges the Department of Commerce, International Trade Administration's (ITA) final results in the first administrative review of antidumping duty orders covering certain chemicals imported from Japan. *Cyanuric Acid and its Chlorinated Derivatives from Japan Used in the Swimming Pool Trade*, 51 Fed.Reg. 45,495 (Dec. 19, 1986). The challenged administrative review covers two Japanese manufacturers of cyanuric acid and its chlorinated derivatives (CA & CD) exported to the United States and the period November 18, 1983 through March 31, 1984. ITA found weighted average dumping margins of zero percent for one manufacturer, Nissan

Chemical Industries, Inc., on the two subject products it exported to the United States—dichloro isocyanurates and trichloro isocyanuric acid. For the second manufacturer, Shikoku Chemicals Corporation, ITA arrived at margins of 1.74 percent for imports of cyanuric acid, 9.66 percent for dichloro isocyanurates and 0.66 percent for trichloro isocyanuric acid. 51 Fed.Reg. at 45,497.

## ARGUMENTS

Plaintiff raises five basic issues: (1) it alleges that ITA violated the statute by including in its calculation of foreign market value sales of merchandise which were not within the class or kind of merchandise covered by the investigation;[1] (2) plaintiff asserts a circumstances of sale adjustment should be made to foreign market value because of differences in value between CA & CD sold in the swimming pool trade and that sold in other trades, and that foreign market value should be adjusted to reflect restrictions on the sale of CA & CD in Japan; (3) plaintiff alleges that ITA's investigation to determine whether certain sales were below cost of production was inadequate;[2] (4) plaintiff alleges that it was deprived of its constitutional right to meaningful participation in the administrative review because of ITA's failure to provide it access to certain documents relating to the cost of production investigation; and (5) plaintiff objects to a circumstances of sale adjustment to foreign market value for Shikoku's advertising expenses.

Plaintiff's motion is opposed by defendant and two intervenors. The intervenors are the foreign producers of the relevant chemicals that were the subject of the investigation.

1. Plaintiff raises other arguments regarding the sales to be included in calculating foreign market value. It argues that sales of merchandise outside the class were not in the ordinary course of the subject trade and that certain sales were intended to establish a fictitious market.

2. In a related argument plaintiff argues that ITA conducted its verification based on an inadequate questionnaire response.

## DISCUSSION

### I. Sales to be Included in Calculation of Foreign Market Value

The chemicals under investigation are cyanuric acid and its chlorinated derivatives (CA & CD). For purposes of 19 U.S.C. § 1673 (1982), ITA, in its original less than fair value investigation, defined the class or kind of merchandise under investigation as CA & CD for use in the swimming pool trade. 48 Fed.Reg. 52,497 (Nov. 18, 1983) (Preliminary Determination). Both respondents in this case sold CA & CD in granular form in the United States.

In order to determine whether goods are being sold in the United States at less than fair value, ITA must compare the foreign market value of the subject merchandise with the price at which such merchandise is sold in the United States. 19 U.S.C. § 1673 (1982). Foreign market value is defined, in relevant part, as the price, at the time of exportation of such merchandise to the United States, at which "such or similar merchandise" is sold in the "ordinary course of trade" in the home market of the country of exportation. 19 U.S.C. § 1677b(a)(1) (1982).

Pursuant to 19 U.S.C. § 1677(16) (1982), there are three categories of such or similar merchandise. The first category is the preferred category and it is to be used if sales of such merchandise exist.[3] It includes merchandise which is the subject of the investigation and *other merchandise which is identical in physical characteristics to the merchandise under investigation.* Sales of CA & CD in granular form were made in Japan. To a large degree, however, they were made outside the swimming pool trade.[4] Plaintiff argues that because CA & CD in granular form for use outside the swimming pool trade do not fall

3. *See Timken Co. v. United States,* 10 CIT ——, ——, 630 F.Supp. 1327, 1336 (1986).

4. Apparently, granular CA & CD is not used very often in swimming pools in Japan as there are few private swimming pools in Japan. It is granular sales for swimming pool use in the United States that concern petitioners most.

within the scope of the class or kind of merchandise to be subjected to antidumping duties in the United States, ITA erred in its selection of the basis for the determination of foreign market value. ITA argues that it is following the words of the statute exactly as set forth, and that it has no choice under 19 U.S.C. § 1677(16) but to proceed to include in its foreign market value calculations merchandise with identical characteristics as that under investigation.

Plaintiff has presented no credible argument that the literal words of the statute should be read in any other way than that suggested by ITA. The words of the first category of § 1677(16) can only mean that other identical merchandise is to be included even if it is not the merchandise which is in the relevant class. Plaintiff argues that ITA's literal interpretation of the statute may produce absurd results. Plaintiff argues it is simply inconceivable that Congress intended non-subject merchandise to form the basis for establishing foreign market value. Essentially, the argument is that the comparison being made is of apples and oranges. The answer here is that apples are apples no matter who buys them and that a market or use limitation on the subject class, by itself, does not restrict the basis for the fair market calculation if all the merchandise included is physically identical.[5]

The general rule of law is that a statute must be applied according to its plain language unless absurd results are produced thereby. Plaintiff's speculations about the conduct of the producers here, *see* discussion *infra,* is not a demonstration that the plain language is absurd. The antidumping law does not counteract all conduct of harm to plaintiff. Furthermore, it does not contain every safeguard possible to prevent avoidance of dumping margins by foreign producers in situations where their conduct might seem to plaintiff to warrant duties. The antidumping laws counteract dumping in a very specific way. ITA is not at liberty to alter the scheme.

In a related argument, Monsanto argues that sales not made in the swimming pool trade are outside the ordinary course of trade within the meaning of 19 U.S.C. § 1677b(a)(1)(A) (1982), and may not be included in the fair market value calculation. The term ordinary course of trade, is defined at 19 U.S.C. § 1677(15) (1982) as "the conditions and practices which ... have been normal in the trade under consideration with respect to merchandise of the same class or kind" as the subject merchandise. According to Monsanto's reading of the statute, if the sales are not sales of the class or kind of merchandise defined by ITA, i.e., those within the swimming pool "trade," they are not sales in the ordinary course of trade and should be excluded from the fair value comparison.

To read the statute in the manner suggested by Monsanto would cause it to conflict with the hierarchies set out in section 1677(16), which indicates that merchandise that is physically identical to that in the subject class should be the basis for foreign market value, if such merchandise is available. The commonly understood purpose of the ordinary course of trade provision is to prevent dumping margins from being based on sales which are not representative, for example, sales of obsolete merchandise. Ordinarily such sales are not appropriate for comparison purposes. A sale destined for a different type of end user is not automatically a sale made under different conditions or pursuant to different practices than sales made to the end user described in the subject class, so as to render the sale outside the ordinary course of trade. Some confusion may have been caused in this case because the scope of the investigation order has been defined as the swimming pool trade. It is difficult to reconcile the use of the word "trade" in the scope determination with the way the word is used in the ordinary course of trade definition. Perhaps if ITA had said the subject of the investigation was CA & CD sold for swimming pool "use" this issue would not have arisen.

---

**5.** The market limitation on the subject class can lead to other bases for exclusion from the calcu-

lation or to adjustments to sales values. That is not the argument addressed here.

The language of section 1677(15) would appear to mean in this circumstance that if the ordinary conditions of trade are different for some of the identical merchandise than they are generally for the merchandise which is in the class or kind as defined by ITA so as to make the sales unsuitable for comparison purposes, then such sales should not be considered as in the ordinary course of trade. Such a reading does not conflict with section 1677(16). Plaintiff has not demonstrated that any of the sales of granular CA & CD used in computing foreign market value were made under conditions and according to practices which are different from those ordinarily applicable to sales of CA & CD for swimming pool use.

■ Another argument supporting plaintiff's claim that foreign market value was determined incorrectly is that ITA was obligated to investigate sales of other forms of CA & CD in the home market in order to determine whether a "fictitious market" had been created. According to plaintiff, the cost of producing tablets as opposed to granules is not substantial.[6] Plaintiff asserts that because tablets are not within the subject class, the producers, without penalty, can recoup the losses they might incur by making low priced home market granular sales by charging high prices for tableted CA & CD in Japan.[7]

The statutory provision concerning disregard of fictitious markets in establishing foreign market value is codified at 19 U.S.C. § 1677b(a)(1)(B) (1982).[8] Prior to 1988,

at least, it would have been very odd for ITA to disregard a substantial number of sales of identical merchandise to unrelated parties on the basis that such sales were intended to establish a fictitious market.[9] Investigation of non-identical forms of merchandise in such a situation would not seem to be called for by the pre–1988 law. The problem is that a manufacturer may support dumping by a variety of practices. The antidumping law appears not to require ITA to investigate in detail the totality of a manufacturer's operations. That the 1988 law allows ITA to look beyond sales of the subject merchandise does not mean that ITA should have interpreted the pre–1988 law to require it to investigate in the same manner. ITA acted reasonably under the facts of this case and the law as it existed before 1988.[10]

There seems to be agreement that, excluding other factors, there is a significant enough number of granular sales for ITA to have based its determination on actual sales of granular CA & CD in the home market. There is also no challenge made here to the scope of the subject class. Under the circumstances of this case, it appears that ITA has no reason not to follow the plain words of the statute. There is no evidence indicating that ITA should change the data on which it based foreign market value to exclude sales of granular CA & CD merely because they are not made for swimming pool use or to include non-granular sales in its investigation. As there has been no challenge to ITA's determination

---

**6.** Apparently a binding agent is added and the chemical is compressed. A small cost difference leading to price differences, however, could cause margins to change from *de minimis* to effective levels.

**7.** The record does not reveal a price differential between granular and tableted sales in Japan that is unrelated to the value of the differing physical forms or other acceptable pricing factors, nor does it show that the Japanese producers are pricing their granular sales, including the non-swimming pool granular sales, in some artificial manner because of the presence of tableted sales. Plaintiff requests an investigation to establish these facts.

**8.** The statute states that "[i]n the ascertainment of foreign market value ... no pretended sale or offer for sale, and no sale or offer for sale

intended to establish a fictitious market, shall be taken into account."

**9.** Section 1319 of the Omnibus Trade and Competitiveness Act of 1988 indicates that ITA *may* consider price movement as to different forms of merchandise after issuance of an antidumping order as evidence of the establishment of a fictitious market, if the movement in such prices appears to reduce the amount by which the foreign market value of the merchandise exceeds the United States price of the merchandise. Pub.L. No. 100–418, 100th Cong., 2d Sess. (1988) (H.R. 4848).

**10.** The court makes no determination as to what ITA *may* or *must* do now.

that all granular CA & CD are the products which are identical in physical characteristics to the products sold in the United States that are to be the subject of any antidumping duties, ITA has proceeded properly in applying 19 U.S.C. § 1677(16), § 1677(15) and 19 U.S.C. § 1677b(a)(1)(B).

## II. Effect on Foreign Market Value Calculation of Differences Between Swimming Pool and Non–Swimming Pool Sales

Monsanto argues that it is entitled to a circumstances of sale adjustment to foreign market value on account of any differences in value or cost between swimming pool and non-swimming pool merchandise. Under the statute, a circumstances of sale adjustment allows the administering authority, ITA, to make "due allowance" for differences in circumstances of sales in the two markets being compared. 19 U.S.C. § 1677b(a)(4)(B) (1982). The adjustment is intended to address and correct situations in which a difference (or lack of difference) between United States price and foreign market value is "wholly or partly due to ... differences in circumstances of sale." *Id.* *See* 19 C.F.R. § 353.15 (1987).

Monsanto believes the relevant sales in the U.S. market, being for swimming pool use, are unfairly compared to non-swimming pool foreign market sales which are allegedly priced differently from swimming pool sales.[11] Plaintiff made this argument at the administrative level and even argued that an adjustment because of differences in packaging between swimming pool and non-swimming pool sales was necessary. There is, however, no evidence of record that whatever differences may exist between prices of pool and non-pool merchandise are related to differences in packaging, or of any other differences between foreign and U.S. sales in terms of costs, expenses, or value. *See* 19 C.F.R. § 353.15 (1987).

Monsanto also argues that ITA must adjust foreign market value to reflect certain restrictions on use which apply to CA and CD sold in the swimming pool trade. Specifically, plaintiff asserts that the manner in which CA and CD were packaged for sale in different markets might restrict the ability of the ultimate consumer to use them.[12] Both the statute and ITA regulations provide for an adjustment to home market price when home market sales are restricted in such a manner as to affect the value of the merchandise to the purchaser. 19 U.S.C. § 1677(14) (1982); 19 C.F.R. § 353.3(b) (1987). Defendant responds that packaging was not the type of restriction contemplated by Congress when it enacted the present wording of this section of the statute.

Plaintiff's argument has little appeal. Both the wording of the statute and its legislative history lead the court to believe that this section of the statute was intended to address restrictions placed by the manufacturer on the disposition of the merchandise by the purchaser which adversely affect the market value of such merchandise, such as restrictions on resale. *See* S.Rep. No. 1619, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin. News 3498, 3500–03. Plaintiff has failed to present a convincing argument that Congress intended a broader interpretation of this provision which would include differ-

---

11. The record reveals evidence of some difference in prices among granular sales for various markets in Japan. Apparently, for some markets, lower cost alternatives are available. The producers do not concede that any significant price differential exists.

12. Specifically, plaintiff now asserts that the size of the packaging might have an effect upon the ability of a particular consumer to use that package, *i.e.* large quantity users, such as sewage treatment users, would have little use for small packages, and vice-versa for small quanti-

ty users such as swimming pool users. Plaintiff also theorizes that "[s]imply by not putting directions on the back of the package destined for the sewage treatment trade, the Japanese producer could ensure that the low priced CA & CD would not be bought by a consumer in the swimming pool trade," who supposedly depend upon the directions on the package to tell them how much product to use. Plaintiff's Brief at 33–34. As a great deal of the material at issue is sold to institutional users it is unlikely that the producers are "restricting" sales in this manner.

ences in packaging of the type described here.

Moreover, defendant correctly notes that plaintiff did not articulate this argument clearly in the administrative proceeding below. This is the kind of factually based collateral issue that, under the circumstances of the case, the agency cannot be held responsible to examine unless it is spelled out during the administrative proceedings.

## III. Adequacy of Cost of Production Investigation

 With regard to one producer, plaintiff challenges the adequacy of ITA's investigation to determine whether significant sales were below the cost of production. *See* 19 U.S.C. § 1677b(b) (1982). Under the statute, whenever ITA has reasonable grounds to believe, or suspect, that a foreign producer is selling in its home market at prices below the cost of production, ITA must determine whether that producer is in fact making sales at less than cost. *Id.* In the present case, ITA's investigation proved negative and therefore actual home market prices were utilized.

During the course of the investigation, the concerned producer submitted data in response to ITA's questionnaire which ITA considered to be fully responsive. Accordingly, ITA proceeded to verify the information. Monsanto argues that the response was inadequate because it did not contain specific cost data on input products. Monsanto also alleges that ITA cannot allow such inadequacy to be cured by accepting further information at verification and after verification. Monsanto asserts ITA was not prepared to focus on certain areas of concern, because the relevant information was not present in the questionnaire response *prior to* verification.

The producer uses a cumulative cost of production accounting method whereby the costs for each stage of production are aggregated and carried forward. In its questionnaire response, the producer provided cumulated cost information. During verification, ITA traced various items back through the production process and found that the information provided in the questionnaire response was accurate. Various costs and expenses for labor, raw materials and energy were checked. Confidential Record Document Number (CR) 19.[13] In general, ITA appears to have conducted an adequate verification although it did not examine in detail every aspect of the cost of production information which concerns Monsanto. Verification is a spot check and is not intended to be an exhaustive examination of the respondent's business. ITA has considerable latitude in picking and choosing which items it will examine in detail. *See Hercules, Inc. v. United States,* 11 CIT ——, 673 F.Supp. 454, 469 (1987). Furthermore, ITA may accept, as it did here, post-verification information which indicates that the original questionnaire response was correct or clarifies it.

Monsanto has not argued that ITA's general method of investigation is inadequate, but, rather, that because of an inadequate questionnaire response Monsanto could not raise all issues which it now sees and that ITA has not obtained complete answers to all of these questions. Much of the confidential information, such as the confidential questionnaire responses, were received by Monsanto's counsel during the administrative proceeding, and Monsanto did raise at the administrative level almost all of the issues, including sub-issues, it raises here. A few elaborations of earlier arguments may be based on verification documents obtained subsequently.

Although it finds ITA could proceed as it did, the court will discuss what seems to be some of the more troubling questions raised by Monsanto. First of all, the producer was allowed a credit for a product which is produced during one of the stages of the production of CA & CD. ITA considered this to be a by-product as opposed to an intermediate product or co-product and, accordingly, as is normal under general accounting principles, a credit against cost was given for the value of the recovered by-product. *See* W. Morse & H. Roth,

---

**13.** This includes intra-company transfer materials.

*Cost Accounting* 157 (2d ed. 1986). Monsanto argues that the valuable by-product is not produced until further processing occurs and thus a full credit against cost should not have been allowed. Alternatively, it argues that the product should have been treated as an intermediate product for which no credit against cost is generally allowed. The producer responds that Monsanto has misperceived which product is produced, and that no further processing is required.

The court is aware of no evidence that the valuable by-product was not produced or that additional processing occurred. By contrast, one of the documents produced by the respondent before this issue was raised references the very by-product that respondent claims was actually produced. Nissan Cost of Production Verification Document Number N-CA1 at 176. In addition, the court is aware of nothing in the record which supports plaintiff's assertion that an intermediate product was produced. ITA saw no reason to investigate this matter further during the verification and Monsanto has presented nothing to indicate that the documents presented by the producer were not truthful on this point.

Monsanto next claims that a large portion of the producers' expenses are attributable to research and development (R & D), and that one of the publications issued by the respondent indicates that a substantial percentage of its expenses are for R & D. Monsanto acknowledges that ITA verified "factory" R & D costs, but it claims that "corporate" R & D costs, R & D costs incurred for general corporate purposes distinct from R & D costs at the factory level, may have been overlooked. The producer claims that corporate R & D is part of general expenses which were properly allocated. There is nothing in the record

that indicates that the R & D costs are not fully accounted for either through direct factory costs or through allocation of general expenses.[14]

A final problem, which seems at first glance to present some difficulties, is the question of whether ITA utilized a proper depreciation time period in its cost of production calculations. The controversy centers on equipment for which the producer used, or claims to have used, an eight year depreciation period, in accordance with Japanese tax laws. ITA asserts that it accepts depreciation periods which are in accordance with generally accepted accounting principles, and the depreciation period required by the law of the producer's country would be appropriate.[15] Plaintiff claims that the respondent's data is not consistent with this assertion. Supplemental submissions seem to indicate that the eight year depreciation period was used and that the particular depreciation time period is industry specific so that factors such as the corrosiveness of the product at issue were likely considered.[16] No deficiency in the investigation is revealed as to this point.

Essentially, Monsanto directs the court to several problematic areas which it believes ITA was obligated to investigate further in order to determine whether the respondent provided accurate information. Monsanto claims that it is not at fault for not particularizing its claims during the investigative stage, because it did not have access to a substantial amount of information prior to the verification, particularly in a form which Monsanto's internal experts may use. Monsanto claims that the producer's public response was too summary and that Monsanto, as a member of the public, should have been permitted access to more detailed data so that it could raise

**14.** There is nothing to support Monsanto's speculation that more R & D costs should have been allocated directly as opposed to being included in the general expense category.

**15.** In *Carbon Steel Products from Brazil,* 49 Fed. Reg. 28,298, 28,302 (Jul. 11, 1984) ITA indicated that, in calculating the cost of production, it would use a firm's expenses as recorded in its financial statements as long as those statements

are prepared in accordance with the home country's generally accepted accounting principles and do not significantly distort the firm's financial position or actual costs.

**16.** As to some issues, there are no complete explanations in the record. These areas were not of concern to ITA and Monsanto has not demonstrated that they should have been.

appropriate questions and thus assist ITA in performing its verification and analysis of information obtained at verification. Alternatively, counsel argues that it should have received access to further data under protective order.

First, plaintiff has not made a case, based on citation to particular meaningful data, demonstrating that the material excised from the public version was by statute or regulation required to be included. *See generally* 19 U.S.C. § 1677f (1982) and 19 C.F.R. § 353.28 (1987). Most of the information sought to be obtained is of a highly confidential nature. Second, Monsanto's counsel did ask for access to confidential data and received some, but not all, such data. Monsanto, however, is entitled under the statute to challenge denial of access for its attorneys to confidential information if it believes it must have that information in order to meaningfully participate. 19 U.S.C. § 1677f(c) (1982). Monsanto brought no such action. It seems that the court should not remand this action to ITA to redo the verification simply because of questions raised now. If plaintiff believed that ITA could conduct a meaningful investigation in this case only with its representatives' input, then it should have sought relief from the court at a time when it would have been more useful. This is the purpose of allowing immediate judicial review of denial of access to confidential information.[17]

If the questions raised by Monsanto here were shown to be substantial, a different result might ensue, but each allegation which superficially seems to have any basis has been appropriately rebutted. Furthermore, plaintiff has made no showing that ITA *should* have investigated anything more. No errors have been found; only areas where ITA might have investigated further. At this point the court will not order ITA to investigate Monsanto's suspicions. ITA was satisfied as to the accuracy of every item it did investigate thoroughly and no substantial errors have been found to date.

## IV. Deprivation of Right to Meaningful Participation

Following its claim that ITA's investigation was inadequate, Monsanto raises the argument that it was denied a constitutional right to meaningfully participate in the investigation because it did not have adequate information in advance of verification.

Unfair trade proceedings are sometimes described as investigatory in nature, but the agency actions which are being reviewed might be best described as quasi-adjudicatory, quasi-investigatory. To the extent the proceedings adjudicate rights, due process concepts may be applicable. Indeed, in requiring parties to fully exhaust administrative remedies under some circumstances, the court recognizes that these actions do not involve only investigative duties of the agency. To the extent the agency is acting in an investigatory capacity, however, constitutional due process concepts seem out of place. *See Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1959). The real question in this case is whether ITA has fulfilled Congressional intent, including providing whatever process the statute defines.[18] Plaintiff here is concerned with the adequacy of the core *investigation*. ITA must be allowed to conduct the investigation so as to fully comply with the statute, whether or not parties request it. In doing this it must have some latitude not to comply with all requests to investigate further. Congress has afforded ITA considerable latitude and discretion in implementing the antidumping laws, especially during the investigative fair value phase. *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 929 (Fed.Cir.1984).

---

**17.** In house Monsanto personnel would not have been allowed access to confidential data. The balance of interests which encourages participation and turn over of confidential data to ITA does not permit such access.

**18.** In *Timken v. United States*, 10 CIT ——, ——, 630 F.Supp. 1327, 1333 (1986), the court recognized that certain statutory duties which went to the core of the investigation must be undertaken whether a party raises the issue or not.

The court is aware that the statute is intended to protect the domestic industry from unfair practices, but it seems highly unlikely that, as to the core investigatory aspect of this proceeding, any rights of Monsanto were trampled. Although the court is not clear from whence Monsanto's constitutional right to participate as opposed to statutory right to participate arises in this case, ITA would not ordinarily violate any such rights by not allowing access to verification exhibits or documentation of the type contained in verification exhibits. The verification exhibits which are not provided often involve the most detailed in-plant information. Obviously, ITA must balance the interest of the various parties and, at the same time, fulfill a statutory directive to promptly complete these investigations.

In order to encourage participation in the administrative proceedings by foreign producers, ITA does not generally allow access to verification documents as this would give competitors access to the most confidential type of material. That the court may allow access to such documents does not lead inevitably to the conclusion that ITA should release them. Parties are often more sanguine about the release of documents under court jurisdiction, with the resultant penalties if the privileges of access are abused. In any case, the court at this stage sees no reason to review in detail, and with hindsight, the question of whether the documents should have been provided as plaintiff did not raise that argument with the court at the time the confidential documents were denied. Plaintiff should not be permitted to wait and see whether the investigation comes out favorably and only then come forward, raise suspicions and challenge the investigation as inadequate because it did not have the documents it needed in order to raise particular questions at a particular administrative stage.

As indicated, the court has determined that plaintiff has not established that either the public or the confidential questionnaire responses were so inadequate as to deprive Monsanto of any rights. Thus, that Monsanto or ITA did not have a fuller response before verification is unavailing. Finally, Monsanto has demonstrated no injury which the court may remedy now that Monsanto's counsel has received further documentation and can formulate more particular arguments about what it might have said either before or after verification.

V. Circumstances of Sale Adjustment for Advertising

■ Plaintiff's final challenge concerns ITA's allowance to one producer, Shikoku, of a circumstances of sale adjustment for home market advertising expenses. Plaintiff specifically alleges that these expenses were not directly related to the merchandise under review,[19] and that these expenses were not directed to the ultimate end users of the merchandise—the customer of Shikoku's purchasers.[20]

Plaintiff's assertion that ITA cannot allow a circumstances of sale adjustment to Shikoku for advertising expenses because it has not shown those expenses to be directly related to *granular sales* in the swimming pool trade must be rejected.

As ITA noted in its final determination, none of Shikoku's advertising, for which an adjustment was allowed, was specifically directed to any particular form of CA or CD. 51 Fed.Reg. at 45,496. Initially in the investigation Shikoku submitted data to ITA allocating advertising expenses incurred for sales of CA & CD in granular and tablet form to both the swimming pool trade and septic tank industries over total

---

**19.** Under ITA's regulations, circumstances of sale adjustments are "limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration." 19 C.F.R. § 353.15 (1987).

**20.** 19 C.F.R. § 353.15 also specifies that "the assumption by a seller of a purchaser's advertis-

ing or other selling costs" would be an example of a difference in circumstances of sale for which allowances may be made but that "[a]llowances generally will not be made for differences in advertising and other selling costs of a seller unless such costs are attributable to a later sale of the merchandise by a purchaser."

home market sales of the same. CR 17 at 6. Wanting more specific data, ITA then requested and received data related to sales in the swimming pool trade. 51 Fed. Reg. at 45,496. Apparently this data yielded a yen per kilogram adjustment figure which could be applied to the volume of granular sales at issue.

The court finds this to be a proper method for allocating such expenses. As stated by our Court of Appeals, "[t]he presence of multiple products or institutional advertising in the same advertisement does not deprive the relevant portion of the advertisement of its direct relationship to the relevant sales." *Smith–Corona Group v. United States*, 713 F.2d 1568, 1581 (Fed. Cir.1983). The presence of copies of advertisements containing pictures of tablets for septic tank use does not indicate that the adjustment made was based on such advertising. This advertisement no doubt related to Shikoku's rejected claim. Plaintiff has proffered no reasonable ground for rejecting the proportional allocation of advertising expenses covering several products, including the investigated product.

Plaintiff's second assertion, that the advertisements were not directed to end users of the merchandise, must also be rejected. ITA specifically requested that Shikoku provide samples of its advertising to the agency so that it might "identify the target for each advertising expense" CR 17 at 6. After examining the newspaper and magazine advertisements submitted, ITA "verified that these samples could be directed to the purchaser's customer and that the end user was correctly identified." *Id.*

Accordingly, the court finds the ITA's determination to be supported by substantial evidence and to be in accordance with law.

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiff's motion for judgement based upon the administrative record is denied and this action is hereby dismissed.