**KERR–McGEE CHEMICAL CORPORATION, Plaintiff,**

and

**Chemetals, Inc., Plaintiff–Intervenor,**

v.

**UNITED STATES, Defendant,**

and

**Tosoh Hellas, A.I.C., Defendant–Intervenor.**

**Court No. 89–05–00276.**

United States Court of International Trade.

June 28, 1990.

Drinker Biddle & Reath, W.N. Harrell Smith, IV, Aryeh S. Friedman, Cynthia M. Lighty, for plaintiff Kerr–McGee Chemical Corp.

Squire, Sanders & Dempsey, Ritchie T. Thomas, William D. Kramer, Dana M. Stein, Miriam A. Bishop, for plaintiff-intervenor.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jane E. Meehan, Lloyd M. Green, Gregory Shorin, Atty.–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, for defendant.

Weil, Gotshal & Manges, A. Paul Victor, Jeffrey P. Bialos, Ethan S. Naftalin, for defendant-intervenor.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiffs move for judgment on the administrative record of *Final Determination of Sales at Less Than Fair Value; Electrolytic Manganese Dioxide [EMD] from Greece*, 54 Fed.Reg. 8,771 (1989) (*Final Determination*). In the case at hand ITA found sufficient above cost home market sales of merchandise similar to that under investigation to form a basis for calculating foreign market value (FMV) under 19 U.S.C. § 1677b(a)(1) (1988), the standard method for computing FMV for comparison with United States price. *Final Determination*, 54 Fed.Reg. at 8,773–74. Plaintiffs ask the court to remand this case to the International Trade Administration (ITA or Commerce) for ITA to apply the special provisions for calculating FMV applicable to multinational corporations (MNC

rule), 19 U.S.C. § 1677b(d) (1988). Plaintiffs assert that ITA, by applying 19 C.F.R. § 353.4(a) (1988), improperly ascertained the viability of defendant-intervenor Tosoh Hellas's Greek home market EMD sales for purposes of computing FMV. Plaintiffs also claim that ITA's analysis of which merchandise in the Greek market was "similar" to the products under investigation was improper, that the period of investigation should have been extended or other adjustments should have been made to avoid distortions from production bunching, and that ITA improperly calculated cost of production, and therefore below cost sales were erroneously accepted as viable home market sales.

Defendant-intervenor responds that ITA's application of the standards set forth in 19 C.F.R. § 353.4(a) for purposes of determining home market sales viability was proper. Defendant-intervenor further asserts that Commerce's determination that alkaline and zinc EMD are similar was correct, but that Commerce should have considered alkaline EMD sales as non-viable and utilized only zinc EMD sales in determining home market sales viability. Finally, defendant-intervenor maintains that Commerce's cost of production calculations were proper. The governmental defendant seeks affirmation of each of ITA's findings discussed here.

## I. FACTS

### A. *ITA Proceedings*

Plaintiffs, Chemetals and Kerr–McGee, filed their petition on May 31, 1988, whereupon ITA initiated its investigation, *Initiation of Antidumping Duty Investigation; Electrolytic Manganese Dioxide From Greece*, 53 Fed.Reg. 24,114 (1988), made a preliminary determination, *Electrolytic Manganese Dioxide From Greece; Preliminary Determination of Sales at Less Than Fair Value*, 53 Fed.Reg. 45,793 (1988), held hearings, and imposed dumping duty deposits of 36.72% following the final determination. The ITA investigation extended from December, 1987 through May, 1988 and covered EMD sales by Tosoh Hellas, a Japanese company's Greek affiliate

created in a joint venture agreement under Greek law. At approximately the same time ITA also investigated EMD sales by Tosoh Hellas's Irish sister and by its parent company in Japan. *See Initiation of Antidumping Investigation; Electrolytic Manganese Dioxide from Ireland*, 53 Fed. Reg. 24,115 (1988); *Initiation of Antidumping Investigation; Electrolytic Manganese Dioxide from Japan*, 53 Fed. Reg. 24,116 (1988). *See also Kerr–McGee v. United States*, 739 F.Supp. 613 (1990) (*Kerr–McGee I*).

### B. *EMD Production*

According to Tosoh Hellas' submission to ITA the production process for the two different grades of EMD at issue, zinc and alkaline, differ only in the neutralization and grinding of the manganese oxide base. Confidential Record Appendix (CRA) Vol. II, Doc. 14 at 446A. The record reflects that manganese ore is ground, reduced, then leached and filtered to remove impurities. CRA Vol. I, Doc. 8 at 266A. It is next treated in an electrolytic process, washed in water, and dried in a furnace. *Id.* The manganese flakes are then ground and their PH is adjusted to produce different EMD grades. *Id.* Further filtration and drying precedes final packaging. *Id.* The different grades of EMD are used generally in different types of dry cell batteries; that is, alkaline EMD is used in alkaline batteries and zinc EMD is used in zinc batteries. *See* CRA Vol. II, Doc. 31 at 877A. In addition, alkaline batteries have a longer life than zinc batteries. *Id.*

## II. DISCUSSION

### A. *Background*

The court will uphold an ITA determination under the unfair trade laws unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" under 19 U.S.C. § 1516a(b)(1)(B) (1988). The court "will affirm the agency's findings if they are supported in the record by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alhambra Foundry Co.,*

*Ltd. v. United States,* 12 CIT ——, 685 F.Supp. 1252, 1255 (1988) (citations omitted).

■ ITA's less than fair value determination is dependent on a three step inquiry: (1) ascertaining FMV of the imported merchandise, 19 U.S.C. § 1677b (1988), (2) calculating United States price of such merchandise, 19 U.S.C. § 1677a(a) (1988), and (3) determining the dumping margin, *e.g.* the difference between FMV and U.S. price, 19 U.S.C. § 1673 (1988). The focus in the present case is on the first step of the inquiry, namely calculating FMV. The key issue here is whether EMD sales in the Greek home market were inadequate so as to warrant calculation of FMV on the basis of Tosoh Hellas's parent's Japanese market sales pursuant to the MNC Rule.

Section 1677b instructs ITA to determine FMV by calculating "the price ... at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported." 19 U.S.C. § 1677b(a)(1)(A). If home market sales of the merchandise are not adequate as a basis for comparison with United States sales, ITA normally would turn to third country sales to determine FMV. 19 U.S.C. § 1677b(a)(1)(B). Alternatively, ITA may use, in certain circumstances, cost of production based "constructed value" under § 1677b(e). 19 U.S.C. § 1677b(a)(2).

Special rules apply to nonmarket economy countries and, as indicated, to multinational corporations. 19 U.S.C. §§ 1677b(c) & (d). The MNC rule discussed here is intended to prevent multinational corporations from circumventing the antidumping laws by exporting merchandise from a foreign subsidiary with a low FMV, if FMV were calculated on one of the standard bases. S.Rep. No. 1298, 93d Cong., 2d Sess. 174, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7311. *See also* Powell & McInerney, *Globalization of the Production Process and the Unfair Trade Laws* 22–23 (1989) in *The Commerce Department Speaks: 1990* at 9 (1990).

The MNC rule requires that FMV be calculated "by reference to the foreign market value at which such or similar merchandise is sold in substantial quantities by one or more facilities outside the country of production," whenever (1) the facility under investigation is jointly owned by a foreign national, (2) the sales of the merchandise at issue or similar merchandise are "non-existent or inadequate as a basis for comparison with sales of the merchandise to the United States," *and* (3) FMV of the merchandise of facilities outside the country of exportation is higher than the FMV of merchandise produced in the facility under investigation. 19 U.S.C. § 1677b(d).[1] With regard to the second of the three requirements for application of

---

**1.** In *Preliminary Determination of Sales at Less Than Fair Value; Certain Small Business Telephone Systems and Subassemblies Thereof From Taiwan,* 54 Fed.Reg. 31,987 (1989), *appeal pending from Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof From Taiwan,* 54 Fed.Reg. 42,543 (1989) *sub nom. Auto Telecom. Ltd. v. United States,* CIT No. 90–01–00029 (filed April 26, 1990), Commerce noted that there are two stages to an MNC investigation under section 1677b(d). 54 Fed. Reg. at 31,988. According to Commerce, "[i]n the first stage, the Department must establish that the five criteria for applying the MNC provision are satisfied.... In the second stage, assuming the five criteria are met, the Department must calculate FMV by reference to the FMV of such or similar merchandise produced in facilities outside the country of exportation." *Id.*

The five criteria are:

(1) Merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm or corporation which also owns or controls, directly or indirectly, other facilities for the production of such or similar merchandise which are located in another country or countries.

(2) The sales of such or similar merchandise by the company concerned in the home market of the exporting country are non-existent or inadequate as a basis for comparison with the sales of the merchandise to the United States.

(3) The foreign market value (FMV) of such or similar merchandise produced in one or more of the facilities outside the country of exportation is higher than the foreign market value of such or similar merchandise produced in the facilities located in the country of exportation.

the MNC rule, ITA found sales of the merchandise, or similar merchandise, in the Greek home market "adequate." *Final Determination*, 54 Fed.Reg. at 8,773.[2] Plaintiffs assert that ITA erred in so finding.

B.  *Similarity Analysis under 19 U.S.C. § 1677(16)*

■  To determine whether sales in the exporting country's home market are "nonexistent or inadequate" under the second prong of 19 U.S.C. § 1677b(d), ITA must ascertain the category or categories of merchandise, identical or similar to that under investigation, which it will examine

> (4) ... any observed differences in FMV are not solely attributable to physical differences in merchandise.
> (5) Any observed differences in value between the FMV of products produced outside the country of exportation and the FMV of products produced in the country of exportation are not solely attributable to differences in costs of production, pursuant to the final paragraph of the MNC provision.
>
> 54 Fed.Reg. at 31,988.

**2.**  The MNC rule has been applied in few instances. For example, in *Certain Steel Wire Nails From the Republic of Korea; Antidumping: Final Determination of Sales at Less Than Fair Value and Exclusion From Investigation*, 45 Fed. Reg. 34,941 (1980), ITA calculated FMV in the "unusual way" of applying the MNC rule to Japanese subsidiary corporations which operated in a Korean Free Trade Zone, had no home market sales during the investigatory period, and showed prices lower than "trigger prices," the best information available on Japanese FMV. *Id.* at 34,943. In *Preliminary Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand*, 53 Fed.Reg. 45,334 (1988), Commerce declined to apply the MNC rule, as the Thai home market was found viable under the criteria of 19 C.F.R. § 353.4. Commerce stated that because "home market sales do provide an adequate basis for comparison with the sales of the merchandise to the United States[,] ... we ... determined that the special rule for multinational [corporations] does not apply with respect to sales of the subject merchandise from Thailand." *Id.* at 45,335. Accordingly, Commerce declined to review the Japanese parent's home market price information. *Id.  See also Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand*, 54 Fed.Reg. 19,117, 19,-119 (1989) (referring to Appendix B to *Final Determination of Sales at Less Than Fair Value: Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 18,992, 19,027 (1989) (de-

to determine adequacy of home market sales.  The product under investigation, that is the merchandise at issue, is EMD generally.  It is obvious that ITA believes that a "class or kind of merchandise" under investigation, *see* 19 U.S.C. § 1673, in some cases may consist of several categories of merchandise which are not "similar" to each other under the language of 19 U.S.C. § 1677(16) (1988).[3]  For example, *Color Television Receivers From Korea; Final Results of Antidumping Duty Administrative Review*, 53 Fed.Reg. 24,975, 24,981 (1988), states:

> [S]ection 353.4 of our Regulations instructs us to determine that the total

clining to apply MNC rule even though sales were below the five percent threshold, as it was not shown that Japanese or Singapore prices were higher than home market prices in the exporting country)), *appeal pend. sub nom. The Torrington Co. v. United States*, CIT No. 89–06–00308 (filed June 30, 1989).  In *Certain Steel Wire Nails From the Republic of Korea; Antidumping: Final Determination of Sales at Less Than Fair Value and Exclusions From Final Determination*, 47 Fed.Reg. 27,392 (1982), Commerce applied the MNC rule to a Korean subsidiary operating in a Free Trade Zone. *Id.* at 27,394.

**3.**  19 U.S.C. § 1677(16) states:

> The term 'such or similar merchandise' means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
> (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
> (B) Merchandise—
> (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
> (ii) like that merchandise in component material or materials and in the purposes for which used, and
> (iii) approximately equal in commercial value to that merchandise.
> (C) Merchandise—
> (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
> (ii) like that merchandise in the purposes for which used, and
> (iii) which the administering authority determines may reasonably be compared with that merchandise.

sales of such or similar merchandise is 5 percent or more of the sales of that merchandise to third countries. In making this determination, we established separate 'such or similar' categories based on CTV screen size. All home market models generally within two screen sizes and containing the same tuning system as a given U.S. model were grouped in the same category. The 5% viability test described was then applied to each category found to be viable. We do not consider sales of one model to constitute the universe of sales for viability of the entire home market. We consider such an interpretation of 'such or similar merchandise' for purposes of determining home market viability to be overly specific.

*See also Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems from Taiwan, supra,* 54 Fed.Reg. at 42,544 (1989); *Lightweight Polyester Filament Fabric From Japan; Final Determination of Sales at Less Than Fair Value,* 49 Fed. Reg. 472, 473 (1984); *Lightweight Polyester Filament Fabrics From the Republic of Korea; Final Determination of Sales at Less Than Fair Value,* 48 Fed. Reg. 49,679, 49,680–81 (1983).

None of the parties challenges this concept of dissimilar products within a class. In this case, however, analysis of EMD appears to have convinced ITA that alkaline EMD and zinc EMD were sufficiently similar to be considered together for home market sales viability purposes. *See Final Determination,* 54 Fed.Reg. at 8,773. ITA found both zinc and alkaline EMD to be produced from the same ingredients. *Id.* Although they differ in ultimate use (alkaline EMD being used for alkaline batteries and zinc EMD for zinc batteries), both types of EMD perform the same essential battery filler function. *Id.* ITA found in particular that "the two types of EMD are produced in the same production process and differ only in final finishing." *Id.* ITA also found no difference in the compo-

sition of either EMD type, minimal cost differences in production, equal commercial value, and use of both in the production of dry cell batteries. *Id.*

ITA's practice in analyzing similarity in a merchandise specific and in a market context appears to be in accord with Congress's intent with regard to the term "such or similar." *See* H.R. Report No. 1261, 85th Cong., 2d Sess. 7 (1957). In its report Congress gave the following example:

> If, for example, long-handled shovels are sold to the United States, and only short-handled (otherwise identical) shovels are sold for home consumption in the country of exportation, then it is possible to consider the two types of shovel "similar," and a price determination can be made by comparing the two similar shovels, making allowance for the fact that the long handles cost more than the short handles.

*Id.*

As stated in *Final Determination of Sales at Less Than Fair Value, Portland Hydraulic Cement From Japan,* 48 Fed. Reg. 41,059 (1983), determining "such or similar" categories for FMV purposes requires ITA to look at "similar but not necessarily the same component materials." *Id.* at 41,060. In general, the statutory scheme requires ITA to balance a variety of factors depending on the product at issue.

■ Although plaintiffs argued before the agency that alkaline and zinc EMD were dissimilar as a factual matter, they have not made that case before the court.[4] Instead they argue in essence that because zinc and alkaline EMD are both sold in the home market and are recognized as nonidentical by ITA, zinc EMD cannot form the basis of a home market sales viability determination for alkaline EMD, and vice-versa. Plaintiffs assert that 19 U.S.C. § 1677(16), the applicable section defining "such or similar," mandates that once hav-

---

**4.** Whether or not they preserved this claim in their Complaint is irrelevant because plaintiffs took no steps by briefing before the court or otherwise to show ITA erred in its factual finding of similarity.

ing found several non-identical categories of subject merchandise, ITA should perform its viability test on a category by category basis. Memorandum in Support of Plaintiffs' Motion for Judgment upon the Agency Record at 32–35. (P. Brief). Plaintiffs claim ITA should have calculated home market sales viability with respect to alkaline EMD only on the basis of alkaline sales. Alkaline sales being inadequate, plaintiffs maintain that ITA should have applied the MNC rule. *Id.*

It is true, as plaintiffs maintain, that the analysis of viability stops where there are sufficient identical sales in the home market to provide a satisfactory basis for comparison. P. Brief at 33. *See* 19 U.S.C. § 1677(16); *See also Monsanto Co. v. United States,* 12 CIT ——, 698 F.Supp. 275, 278 (1988); *Antidumping; Mirrors in Stock Sheet and Lehr End Sizes From Italy; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 43,406, 43,410 (1986). The statute, however, directs ITA to continue its search for similar home market products if inadequate identical merchandise is produced in the exporting country. The statute specifies in particular that ITA must examine the section 1677(16) list and choose "the first of the ... categories in respect of which a determination ... can satisfactorily be made." 19 U.S.C. § 1677(16). Only when there are no sales or offers of the identical *or similar* merchandise in the home market, or when home market sales of identical or similar merchandise are "so small" in relation to third country sales that no adequate comparison can be made, or are "inadequate" for comparison purposes, is ITA to turn to third country sales, constructed value, or the MNC rule to arrive at FMV. 19 U.S.C. § 1677b(a)(1), (a)(2), (b) & (d).[5]

ITA's finding of similarity among the non-identical categories of merchandise sold in the home market prevented it from finding home market sales non-viable on the basis of the inadequacy of non-identical merchandise. ITA appears to have followed the statute in basing its home market sales viability analysis on similar merchandise.[6]

C. *Standards for Determining Home Market Sales Viability*

■ Having determined the scope of "such or similar" merchandise for purposes of assessing the adequacy of home market sales, the next issue is how to determine adequacy. ITA found that EMD sales in the home market were adequate because they were well above the five percent viability standard for home market sales set forth in 19 C.F.R. § 353.4. *Final Determination* at 8,774. ITA applied no other standard, asserting that the introductory language to that regulation did not require it to turn to 19 C.F.R. § 353.9 (1988), the regulation reflecting application of the MNC rule, unless the initial viability determination showed inadequate home market sales. *Id.* at 8,773–74. ITA stated in conclusion that "unless the five percent test of § 353.4 indicates there is no viable home market, the requirements of the multinational corporations provision have not been met." *Id.* at 8,774.

The specific issue raised by plaintiffs is whether ITA abused its discretion or erred in its application of the law in deciding that 19 C.F.R. § 353.4(a) provides an appropriate standard for calculating home market sales viability in the MNC context. Under its traditional 19 C.F.R. § 353.4(a) viability analysis, ITA compares home market sales with third country sales and will find home

---

**5.** As indicated earlier, special rules apply to nonmarket economies. *See* 19 U.S.C. § 1677b(c).

**6.** ITA aggregated zinc and alkaline EMD sales and found them adequate so as not to trigger application of the MNC rule. Defendant-intervenor's claim that ITA is required to look first at products identical to those in the U.S. market, and then, if not found sufficient, to disregard them and look separately at similar products to

make a home market viability analysis need not be reached in this case because the home market is adequate under either approach. Likewise the question of whether price comparisons as opposed to market viability determinations should be made on the basis of "inadequate" identical merchandise was not raised and need not be addressed. *See Final Determination* at 8,775. *See also Lightweight Polyester Filament Fabric From Japan, supra,* 49 Fed.Reg. at 475.

market sales adequate for FMV purposes if they total five percent of sales to third countries (not the United States).[7] To ascertain whether there is a viable home market, ITA asks whether "the quantity of such or similar merchandise sold for consumption in the country" is so small in relation to "the quantity sold for exportation" to third countries, "as to be an inadequate basis for determining the foreign market value of the merchandise imported into the United States." 19 C.F.R. § 353.4(a). ITA "normally" uses "five percent of the amount sold to third countries" as the cut-off point for its adequacy determination. *Id.*

Plaintiffs claim that ITA's entire approach is inappropriate, and that the MNC rule dictates an approach grounded in the statutory purpose, whereby ITA would consider a multinational corporation's worldwide profit pattern in addition to its production patterns and the purchasing policies of its customers to determine whether the statute's provisions apply. P. Reply Brief at 5–9. Plaintiffs also claim that over 95 percent of Tosoh Hellas's annual production is exported, and that this indicates an inadequate home market. *See* P. Brief at 28.[8]

The court believes that ITA certainly must consider the purpose of the multinational rule before applying any standard for determining viability to a particular case. The statute, however, does not direct ITA to focus on worldwide profit, production, and purchasing in order to determine adequacy of home market sales, and the statute specifies no particular percentage of production for the home market as compared to total production for export as indicating a non-viable home market. In addition, ITA's use of sales as a basis for

comparison in its viability test, rather than production, conforms with the purpose of the statute: to ascertain the FMV of the merchandise in order to compare it with United States *sales* price and thereby to arrive at an appropriate margin. While a test based on total production might in some case be an appropriate basis for a viability test, plaintiffs have not shown any inconsistency with the statute or unreasonableness in ITA's approach here. In addition, great discrepancies between sales and production have not been shown. See CRA Vol. I, Doc. 9 at 328A.

Although plaintiffs have not proposed any alternative test of useful specificity, for completeness the court will examine the two parts of the viability test used here by ITA. With regard to the specific percentage of sales required, it should be noted that Congress enacted the MNC provision as an anti-circumvention device to avoid the "illusion of no dumping ... produced by comparison of the multinational corporations' prices on exports to the United States with the low prices on its exports to other foreign countries." S. Report No. 1298, 93d Cong., 2d Sess. 175, *reprinted in* 1974 U.S.Code Cong. & Admin. News 7186, 7312. In enacting the MNC rule Congress decided that the "illusion" may exist in circumstances in which the multinational corporation makes "insignificant or no sales to its home market." *Id.* That the "illusion" might exist in circumstances which plaintiffs believe exist here is of no help if Congress has provided a stricter test which is not met.

The statutory provisions governing application of the MNC rule require ITA to look at whether home market sales are "nonexistent or inadequate" before applying the

---

7. 19 C.F.R. § 353.4(a) (1988) states:
    (a) *In general.* If it is established, in a situation other than that provided for in § 353.9, that during the representative period chosen for investigation the quantity of such or similar merchandise sold for consumption in the country of exportation to countries other than the United States (normally, less than five percent of the amount sold to third countries) as to be an inadequate basis for determining the foreign market value of the merchandise imported into the United States,

the foreign market value of the imported merchandise shall be determined either by reference to the price at which such or similar merchandise is sold or offered for sale for exportation to countries other than the United States or by reference to its constructed value. This provision was renumbered as of April, 1989.

8. It is in any case not much less than 90%. *See* CRA Vol. II, Doc. 14 at 451A.

MNC rule's alternative FMV procedures. 19 U.S.C. § 1677b(d)(2). Nonexistent means something that does "not hav[e] existence," see *Webster's Third New International Dictionary* 1537 (1981), and inadequate in this context is understood by the court to be greater than "nonexistent," but closer to nonexistent than to one hundred percent. As indicated Congress has referred to "insignificant" sales. *See* S. Report No. 1298, *supra*, at 174, 1974 U.S. Code Cong. & Admin.News at 7311. In lieu of the word "insignificant," Congress has also used the word "little." *Id.* at 175, 1974 U.S.Code Cong. & Admin.News at 7312. "Insignificant" or "little" would appear to be closer to the five percent ITA standard or the ten percent involved here than to a substantially larger figure.

■ With regard to the regulation's comparison of home market sales to third country sales, it would appear possible in certain cases of heavy United States sales and minimal third country and home market sales that 19 C.F.R. § 353.4(a) might not provide an appropriate test. *See, e.g., Red Raspberries from Canada; Final.Results of Antidumping Duty Administrative Review*, 54 Fed.Reg. 6,559, 6,559–60 (1989). That, however, is a factual situation not before the court.[9] In this case third country sales are the predominant group of sales, CRA Vol. II, Doc. 17 at 552A, and it would not appear unreasonable under these facts to test home market viability against such sales.[10]

The court is, however, concerned that ITA's use of language in its determination here implies that section 353.4(a) provides a hard and fast rule, even though, in other cases, ITA has viewed the rule as a guideline only. Compare *Final Determination* at 8,773–74 and *Red Raspberries From Canada, supra*, 54 Fed.Reg. at 6,559–60 (1989); *Certain Steel Wire Nails From the Republic of Korea, supra*, 45 Fed.Reg. at 34,942. *See also Remand Determination*

of the Investigating Authority In The Matter of Red Raspberries From Canada, Canada–United States Panel No. USA–89–1904–01 at 3 (issued January 26, 1990) ("[i]f as a result of the specific circumstances of a case, the Department cannot accurately judge the adequacy of home market sales vis-á-vis third country sales as a basis for calculating foreign market value, the Department will test the adequacy of home market sales in an alternate manner which is consistent with the antidumping law.").

Despite the language of the determination and defendant's position before the court, the court sees no reason to remand for further consideration of statutory language and purpose. Both ITA's earlier and subsequent decisions indicate an understanding that 19 C.F.R. § 353.4 might not always provide an appropriate home market sales viability test and given the facts of this case there was no reason for ITA to explain in what situation 19 C.F.R. § 353.4 might not be used.

There is nothing to show in this case that ITA did not read the statute correctly or that it would fail to follow it in the appropriate circumstance. Nor is there a showing that ITA failed to make a rational determination in choosing to use the standard of section 353.4, even though the regulation does not directly apply to this case. Despite its arguments regarding profit, production, and purchasing patterns, plaintiffs have proposed no better standard for application to the facts of this case than the one utilized by ITA. Nevertheless, the standard of section 353.4 cannot be blindly applied to every instance of possible application of the MNC rule, and ITA should exercise proper discretion in future antidumping determinations touching upon the MNC rule to ensure that it fulfills the purpose of that provision. There is sufficient indication here, however, that ITA

---

9. Here, home market sales were approximately ten percent and United States sales were less than five percent of total sales.

10. The court also rejects plaintiffs' argument that the words in 19 C.F.R. § 353.4 "other than that provided for in § 353.9" indicate that

§ 353.4 viability standards cannot be applied to the MNC situation. The words refer to the MNC FMV calculation not to the provisions for determining whether a special MNC rule is to be applied.

acted properly in determining home market sales viability under the facts of this case.

### D. *Adequacy Under the Standards of 19 C.F.R. § 353.4*

The record here indicates Tosoh Hellas's home market sales of EMD were approximately 10% of both total sales and of third country sales. *See* CRA Exhibits to Verification of Sales, Doc. 5 at 503A. Plaintiffs argue, nonetheless, that even assuming application of 19 C.F.R. § 353.4, viability does not exist. They claim sales were not in the ten percent range, but rather that sales were not even at five percent of third country sales. They argue that a number of home market sales, in particular sales of zinc EMD, were at prices below cost of production (COP) and should have been disregarded.

19 U.S.C. § 1677b(b) mandates that sales made at less than COP be omitted from the FMV calculation if they are made over an extended period of time and in substantial quantities at prices which do not permit cost recovery within a reasonable period and in the normal course of trade. Home market sales might be inadequate here even under 19 C.F.R. § 353.4, if some of the zinc sales were eliminated from consideration because they were below COP. In such a case ITA might be required to turn to Japanese sales under the MNC rule, as plaintiffs claim.

### 1. Production Bunching

■ The most important COP issue raised by plaintiffs is their claim that Tosoh Hellas bunched production during the period of investigation (POI), thereby creating lower than normal per unit COP for EMD production. P. Brief at 38–39. Plaintiffs assert that a Tosoh Hellas brochure shows that the facility's average annual production capacity is 12,000 tons per year. P. Brief at 36. Using this number plaintiffs claim that production during the POI was unusually high and Commerce should

have made appropriate adjustments. *Id.* at 36–39. The record reveals annual production to be greater than 12,000 tons. CRA Vol. I, Doc. 9 at 326A. ITA verified the higher figure and there is no reason shown in the record to reject it. Under ITA's calculations it is likely that more than fifty, but less than sixty, percent of one specific annual production figure occurred during the POI. This could be a normal variance and by itself this seems an insufficient reason for abandoning the standard POI or making other extraordinary adjustments. In fact, ITA looked at surrounding periods and found no large swings in production. CRA Vol. II, Doc. 27 at 650A.[11]

Furthermore, Commerce, not Tosoh Hellas, selected the POI under 19 C.F.R. § 353.38 (1988). Consequently, there is no reason to believe that Tosoh Hellas planned its production in advance to bring factory activity up and cost down during the period. Plaintiffs presumably know the manner in which the industry operates and could have requested a longer POI if they foresaw a cyclical problem with the facility's production. Even if plaintiffs had made such a request, ITA would still have had discretion under the facts at hand not to grant that request. *C.f. Monsanto, supra*, 12 CIT at ——, 698 F.Supp. at 283 (*citing Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 929 (Fed.Cir.1984)). *See also* 19 C.F.R. § 353.38. *And see Kerr–McGee I*, 739 F.Supp. at 620–22. Overall, plaintiffs have not met its burden of showing ITA acted unreasonably in utilizing the standard six-month POI and in not making unusual adjustments under the facts of this case.

### 2. Maintenance Costs

The next issue raised by plaintiffs concerns whether ITA properly accounted for maintenance costs during the six-month POI. There is no evidence in the record that a majority of maintenance costs are incurred in August (outside the POI) as

---

**11.** As sales and production were in the same range, CRA Vol. I, Doc. 9 at 328A; Exhibits to Verification of Sales, Exhibit 7 at 503A, the court sees no reason to remand to ITA to investigate further as to whether large amounts of production were inventoried or to perform any other cost adjustments.

plaintiffs allege. P. Brief at 37.[12] While the record does reflect that during the summer vacation period the plant stops operation, *see* CRA Vol. II, Doc. 14 at 451A, maintenance costs during the six-month POI were found to be more than half the amount of total maintenance for 1987 and cannot be said to be unreasonably low in relation to actual production. *See* Exhibits to Verification of Cost of Production, Exhibit 18 at 224A; CRA Vol. I, Doc. 9 at 375A & 377A. Commerce was substantially justified in accepting the verified maintenance costs.

### 3. MnO Allocation

Plaintiffs next claim that Tosoh Hellas improperly accounted for Manganese Oxide (MnO) COP. P. Brief at 41. There is evidence in the record supporting the conclusion that MnO is, and was treated by ITA as, an intermediate product, rather than a by-product. CRA Vol. 1, Doc. 9 at 321A. *See also* CRA Vol. II, Doc. 27 at 642A–46A. A single process converts manganese ore to MnO. MnO may then be sold or may be further processed into EMD. Commerce accounted for the portion of MnO that went into EMD and allocated costs between finished MnO and EMD. *Final Determination,* 54 Fed.Reg. at 8,774. Plaintiffs' alternate methodology of calculating all plant costs toward EMD COP and subtracting out sales value of finished MnO, *i.e.* as a by-product, is not a methodology mandated by the facts of this case or ordinary accounting principles. *See* P. Brief at 42. The record shows that almost all costs incurred by Tosoh Hellas arose from EMD production and that very little was absorbed in the production of finished MnO and that the allocation was reasonable. CRA Vol. I, Doc. 9 at 367A–68A. Commerce was justified in accepting Tosoh Hellas's allocation methodology and the record does not support the claim that the calculations made skewed the COP analysis.

**12.** This issue has some relevance to the production bunching discussion, *supra,* at section II.

### 4. General and Administrative and Other Expenses

Finally, plaintiffs claim that COP numbers should have been adjusted upwards to reflect revisions in sales data made by ITA following verification. P. Brief at 40–41. *See* CRA Vol. II, Doc. 33 at 919A. Revisions in sales data for price comparison purposes do not necessarily compel adjustment of cost data.

ITA accepted Tosoh Hellas's expense allocation methodology based on shipping date because it was not distortive. *See Final Determination,* 54 Fed.Reg. at 8,774. *See also* CRA Vol. 1, Doc. 9 at 326A–27A. This information was verified against the best official financial data available at the time of investigation. *See* CRA Vol. II, Doc. 27 at 675A–82A. The record supports ITA's costing of the general expenses at issue.

In general, calculations based on the rate of exchange provided by plaintiffs show, after conversion to pounds per metric ton, that both zinc and alkaline EMD were produced above the final cost of production figure. *See* CRA Vol. II, Doc. 32 at 914A. *See also* Hearing Transcript at 8–15, 27–29 & 33–34. Plaintiffs' COP arguments do not warrant rejection of ITA's home market FMV determination.

### CONCLUSION

The court upholds ITA's decision not to apply the MNC rule in this matter. The agency followed established practice in making its finding that alkaline EMD is similar to zinc EMD and in considering "similar" merchandise in order to determine whether sales in the home market were "nonexistent or inadequate." In addition, ITA's determination of Tosoh Hellas's home market sales under standards set forth in 19 C.F.R. § 353.4 was not contrary to law under the facts of this case. Finally, ITA's findings that Tosoh Hellas's COP figures were not distorted is based on substantial evidence in the record and is in accordance with law. Accordingly, ITA's

D.1.

determination imposing antidumping duties in *Final Determination of Sales at Less Than Fair Value; Electrolytic Manganese Dioxide From Greece*, 54 Fed.Reg. 8,771 (1989) is sustained in its entirety.

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiffs' motion for judgment upon the administrative record is denied and this action is hereby dismissed.